Mr. Biss, when you're ready. Good morning. May it please the Court. My name is Steve Biss. I represent the appellant in this case, Karen Balas. And I apologize to the Court in advance for the quality of my voice. I'm suffering a terrible cold. Ms. Balas requests... There's hand sanitizer over there before we come down. I'll be sure to use it. Ms. Balas requests the Court to reverse the District Court dismissal of her claims. She requests a trial by jury on the merits of her Title VII claims, her Virginia State claim of wrongful discharge, and her assault and battery claim. And at the outset, I want to say that the briefs in this case by both counsel thoroughly go over the issues, the facts, and so on. During this argument, I want to hit on four points. The District Court erred in failing to consider or refusing to consider the intake questionnaire and the letters that were submitted to the EEOC by Ms. Balas, which are in the record. And the reason I respectfully submit that the District Court erred was in considering the amended EEOC charge, the District Court made an analysis that the EEOC never would have made, and the analysis was that the amended EEOC charge superseded and nullified the earlier intake questionnaire. And the closest analogy that I can find to an argument why that was an error is not only does the EEOC rules and regulations consider the amendment as a clarification or an amplification, not a superseding or nullifying amendment, but when the court looks at SLOOP, for instance, you get into issues of the complainant, Ms. Balas or the complainant before the EEOC, you get into issues of intent. And in SLOOP, for instance, we had a finding by the District Court and this court that the complainant had no intent to amend her initial ADEA charge to include a subsequent retaliation claim. And there was extensive analysis of the state of mind of the complainant. The District Court should not have treated this as a superseding amendment nullifying the prior intake questionnaire. And once that error is unraveled, then the ruling that Ms. Balas' Title VII claims of hostile work environment and sexual harassment were dismissed ought to be reversed. The intake questionnaire and the letters? Yes. There were two letters. There was the intake questionnaire and there was an accompanying letter dated July of 2010. And then there was a subsequent letter, October 2 of 2010, and then an amended charge. Are intake questionnaires made available to respondents, to employers? I can't. I really don't know the answer to that question, whether they're made available to the employer as a matter of rule or regulation. I don't believe there's a rule or regulation that says you've got to send them the intake questionnaire. I think, Judge Duncan, I think that's left up to the discretion of the EEOC officer who's in charge of sending the file to the employer. And that gets to another one of Ms. Balas' points, and that is, and this is a point that's been recognized by several circuits. We've cited some cases in the brief that the complainant, Ms. Balas in this case, really should not be penalized, especially when she's proceeding without an attorney, should not be penalized by the discretion exercised by the EEOC in presenting the claim to the employer. Well, but there's a different point to be made there based on my 10 years or so at the EEOC. I do not recall that it was the norm for an intake questionnaire to be sent to an employer. And the reason it matters is that the charge is what puts the employer on notice of the claims against it. So it's a due process issue that the employer be aware of what the charges are, and it forms the basis for the EEOC to attempt voluntary conciliation. So it has a purpose beyond the internal EEOC process and the communication of the charging party. I understand that. And we're sort of, in this case, we're sort of in a catch-22 where we do have, clearly, the record shows we have an intake questionnaire with a detailed letter accompanying it with various charges in it that was submitted to the EEOC in July. And then we have a subsequent amendment. It was clearly intended by Ms. Balas to be an amendment stating, quote, additional basis for her claims. But it's interesting that you mentioned SLUIP because in SLUIP, we specifically said that it would be objectively illogical to view a private letter to the EEOC as constructively amending a formal charge, given that one of the purposes of requiring the filing of charges is to put the charged party on notice of the claims against it. Well, my response to your question is that we're in a sort of a catch-22 in this case because we have a complainant who made an initial charge in July of 2010, and then she submitted a letter to the EEOC, which the EEOC then used to create an amended charge. The employer did not get the intake questionnaire. I think the record establishes that. The employer ought to have been on notice in receiving an amended charge that there was some prior charge to be amended. I submit, Judge Duncan, in response to your question, the complainant in any EEOC should not be penalized by the EEOC's failure to send the intake questionnaire to the employer. What should have happened is the EEOC should have sent the intake questionnaire with the amended charge or all the papers to the employer, and the employer then should have been able to assess whether they wanted to settle or resolve in some other manner. Are you aware of whether or not the EEOC has the discretion to do that? I'm not aware of whether they have the discretion to do that, but if they exercise the discretion not to send a material part of the complainant's charge, that discretion should not be used then to bar a complainant's subsequent lawsuit, and I think that would be patently unfair because the complainant, Ms. Ballas, without the benefit of a lawyer, doesn't know the answer to all these questions that you pose. What is the discretion of the EEOC? Have they exercised it properly? What did the employer get? She's put in an impossible position, I submit to the court. Well, and I appreciate that. The problem, though, is you don't know whether the EEOC had the discretion either, as far as I can tell. I mean, I don't know that the EEOC could have turned the intake questionnaire over to the employer to put the employer on notice. It's not just the complainant's problem. It also becomes a larger problem in evaluating and also in ensuring, as the regulations in our case law requires, that the charged party be put on notice. Well, I submit that if there is any doubt that it ought to be resolved in allowing the claim to go forward, especially given the salutary purpose of the EEOC process. How do you address the Seventh Circuit's view of this in the Novitski case, which essentially said that, you know, it's up to the claimant. She doesn't have to rely on a faceless bureaucrat to draft these charges. She can do it herself. She can hire a lawyer. I guess as with any other type of action, the EEOC is in an administrative position and is put there to allow for this avenue to be exercised before you get this ability to sue or move on from there. But without that layer, that's the position every other plaintiff is in. I mean, they can choose to hire a lawyer to bring the action or they can draft it themselves or however. So why should someone in this position who actually has the advantage of having an agency to draft some charges for her, why should she be given an additional consideration that someone who even without that help couldn't get? Well, there are dissenters in other circuits, and we've cited those in our brief, and I'd have to go back to the brief to read you the citation, that indicate that the complainants are not penalized by the negligence of the EEOC. There is no negligence of the EEOC established here or, frankly, even alleged here. Is there? Well, there is to the extent that the EEOC failed to send to the extent that this is an issue, that the EEOC failed to send to the employer a copy of the intake questionnaire with her other allegations. That was the duty of the EEOC. That was not the duty of Ms. Ballas, I submit, under the rules and regulations of the EEOC itself. And the district court's rationale was they weren't going to consider the intake questionnaire and or the July letter because the amended charge superseded it. And I respectfully submit that's an error on the district court's part because there is no – the EEOC regulations don't talk about a superseding. They talk about an amplification and a clarification. The district court ought to have considered the intake questionnaire and the July letter. The retaliatory termination claim, the causal link, we've addressed this thoroughly in the brief, but I want to hit on it. The retaliatory – the causal link issue ought to have been for the jury to decide. The evidence that was before the court was that Mr. Price was involved in the firing decision. He conducted the investigation that led to the firing. He recommended that a co-worker not be rehired. We've cited the proximity in time between the termination and the alleged protective activity. We've also alleged the performance evaluation as being evidence of a causal connection. On the wrongful discharge claim under state law, I just want to call to the court's attention, we did not – the Virginia Supreme Court is aware of the case. And in that case, the Virginia Supreme Court on certification decided as a matter of law that a claim where – that the discharge resulted from the refusal of a woman to engage in the crimes of adultery and lewd and lascivious cohabitation was sufficient to support a wrongful discharge tort claim under Virginia law. The Virginia Supreme Court relied on Mitchum versus Counts, and I submit again, the district court erred in refusing to allow Ms. Ballas to amend her Virginia state tort claim to include other ground public policy. The assault and battery, again, factual issues for the jury. The district court was not disturbed by the fact that this was a hug. The district court found that this was just a hug by a coworker who was thankful that he had gotten some cookies. And I submit that the district court disregarded – substituted itself for a jury and disregarded the other facts. Ms. Ballas, in her deposition testimony, said it was offensive. There was a history of seriously inappropriate misconduct between these parties. They – the testimony from Ms. Ballas was that she grabbed him – he grabbed her hard, and he swooped in in her small cubicle space and grabbed her. From those – She gave him some Christmas cookies and then he hugged her. That's your view, Judge Wynn. That's – That apparently is the view of the other side, but it's also the evidence that the court relied upon. And there was much more evidence. Tell me what more was there. She gave him some Christmas cookies, and after she gave him the Christmas cookies, what did he do? He swooped down on her. He grabbed her hard in her small cubicle as she was getting up to leave. And a jury could find on those facts that it was an unwanted – How do you describe grab? Well, that again is for the jury. The jury is going to hear the testimony at trial. What is the evidence? Grabbed her. And most favorable to you, what do you say that evidence is? He grabbed her hard. He grabbed her with his hands. He grabbed her hard. It was not a hug. No, and the deposition – no, it wasn't a hug. And that's why there's a dispute here over the material facts on the assault and battery. We've cited a legion of cases and a string cite in this brief on cases that went to juries in the Virginia Supreme Court. It sounds so unusual that someone who would get Christmas cookies would respond by grabbing someone. Well, given the history, Judge, it may not be so unusual. Instead, you never cease to amaze me. He gave her Christmas cookies. She gave him Christmas cookies. He touched her. It's a little hard to hug someone without touching them. And he said, you never cease to amaze me. And, again, he didn't just hug her. The testimony and the evidence is he swooped in and grabbed her hard in an offensive manner that she didn't want in a small cubicle space. There is evidence from which the claim could go – this is a jury issue. Well, no, she – actually, I think she said it was a hug. She did say it was a hug. And she did say that – and she also said she grabbed him. I thought she said it was a grab. She also said that he grabbed her. I mean, there's testimony – What did he do? Did he grab first and then hug, or did he hug and grab? Well, the jury may weigh the evidence. In the evidence most favorable to you, which did he do? Grab. And not hug? That's the evidence most favorable to me. And not hug? And not hug. Even though she said he hugged. But she also said grab. I mean, she's described this in her testimony several different ways. And the jury ought to decide and weigh the evidence and the credibility of these two witnesses considering all of the evidence. But the discrepancy is within her testimony. But it's a discrepancy that is explained in other parts of the testimony by her. She explains that this was not a simple hug. She explains that he swooped in and grabbed her and hugged her. Well, does that fact combined with the sexual history leave your battery claim intact? I think it does. I think it leaves the assault and the battery claim intact. And the jury may disagree that this was not an assault because he just hugged her, that she didn't have a fear or apprehension. The jury may find that it was not a battery because it was just a simple hug. Is it an objective standard? Well, I think it is an objective standard, but I think it's up to the jury to decide based on the totality of the circumstances. Thank you. May it please the court. I'm Scott Kesman. I'm representing Huntington Ingalls Industries. You may have heard of it. It used to be Newport News Shipbuilding. I guess I work in reverse order here, and we can start with the hug. All right. It's important to note that the summary judgment record that this was decided on was undisputed. We listed 44 separate facts in our summary judgment motion. Ms. Ballas attempted to dispute two of those. Those turned out to be quotes from her deposition that she later decided she didn't agree with. So the district court was working with an undisputed summary judgment record. And on those undisputed facts, it was undisputed that she had come in over the Christmas holiday while she was on vacation and left cookies for Mr. Price's family. It was the first day after the Christmas break that she had come back to work, that Mr. Price came to her, said thank you for the cookies. He never ceased to amaze me. He bent down. She was seated. He bent down, hugged the plaintiff, and she started standing up. Okay. She never told Mr. Price to stop. She says the hug was not extended. She never told Mr. Price the hug wasn't welcome. And these were people, these were coworkers. They'd been coworkers for several years. They shared personal conferences. They had a personal relationship in addition to a work relationship. They had had some difficulties along the way. Well, in any supervisor-subordinate relationship, I'm sure there are rockier patches, but on the whole. Had there been some advances to her, sexual advances to her previously, and she may have gone along initially and then decided not to? It's actually the other way around. She had slipped Mr. Price a note saying that she might be interested in him. Are there undisputed facts on the wrong summary judgment? Yes. What are the facts that have not been disputed with respect to the nature of their relationship? The facts were that Mr. Price was her supervisor. The facts were that they had shared personal confidences with each other. Are there disputes about any of these? No. I only want, okay, I'm asking you. No. These are in the summary judgment. These were in our listing of undisputed facts that were not disputed. Can you have a battery without an assault? Yes. I think you could come up from behind somebody. They wouldn't have the fear of the impending battery. I do believe you could, Your Honor. But, again, this is all context-based. I know, for example, it's this court's tradition to come down and greet counsel. I've never met Judge Duncan before. But if she's coming to shake my hand and all of a sudden this bald lawyer from Norfolk is trying to grab her, the context might suggest to her that she's wondering what's going on and she might be in fear of what's going to happen. You might not want to do that. I'm not suggesting that that's going to happen, as we agree. But if I had practiced law with Judge Duncan and I had gotten a Christmas gift from her, it might be highly inappropriate for me to do that, but would it be an assault and battery? You have to look at context. And the context here was someone thanking a person who had baked Christmas cookies for a family. And the problem, and if you look, I want to read a specific part of Ms. Ballas' testimony that's in the record. This is at 266 in the Joint Appendix. And I asked the question, did Mr. Price express any sort of ill will or ill intention towards you during this? Like I said, it was the way he swooped me at my waist or the way he grabbed me what felt offensive. And the fact that I was in motion to stand up bothered me too because, like I said, I couldn't create distance. I wasn't expecting it. Was there any evidence in the record by her that the touching was unwanted? No. She specifically said she never told him to stop as the hug was going on. And the hug was not extended. It wasn't a he got on and held on. She said it wasn't extended. There was no profession that there was any sort of a problem. I assume that there was or there is evidence in there. How could a battery claim be decided as a matter of law if that's in the record, an unwanted touching? Because from the context, Your Honor, a touching can be excused or justified as a matter of law. You can look at the context and you can say, look, this is not battery, OK? These are all very context dependent. And the context here was undisputed. Ms. Ballas, there were not any facts in the record that contradicted the fact that she'd given the cookies, that it was the first day after the break, that he thanked for the cookies and said you never cease to amaze me, that she never told him to stop, that the hug wasn't extended, that she didn't tell him it wasn't welcomed, that her problem with the hug was it was awkward, I think was the word she used, because of the way she had decided to stand up and he was coming down at the same time. But even then, the hug, the testimony I just read, he touched her waist. He didn't grab for any intimate parts. So, again, the district court correctly decided that in this context, again, nobody's saying it's advisable to hug coworkers or subordinates, but these are people we're dealing with. And for people to have to be hauled into court and accused of assault and battery because they're thanking somebody for cookies is beyond the pale. As far as the wrongful discharge claim, Mr. Biss talked a little bit about the Van Buren case. There's, I guess, three bases Ms. Ballas asked to amend her complaint and add. One was 18.2-344, which is the fornication statute. The Virginia Supreme Court, based on Lawrence v. Texas of the U.S. Supreme Court, has invalidated, has said that statute is unconstitutional when you're talking about adults. And Ms. Ballas and Mr. Price were adults, and if Ms. Ballas would have agreed, if Mr. Price did solicit sex from her and if she had agreed, she would not have been committing criminal conduct because that statute, unlike at the time of Mitcham, has now been held to be constitutional involving adults. Second, and this is an interesting one, is the lewd and lascivious cohabitation statute. That statute, there's not a lot of case law on it, but there is one case from the Virginia Supreme Court, Everett v. The Commonwealth of Virginia, 214 Virginia 325, that explains this statute. And the first thing the Supreme Court does is say, look, there are two different offenses in this statute. And they're stated in the disjunctive. The first one is lewd and lascivious cohabitation by persons not married to one another. There's never been anything in the record, any suggestion of cohabitation here. That's off the table. Second offense, open and gross lewdness and lasciviousness by persons married or unmarried. So that would have to be the basis that Ms. Ballas would be citing to. Here, in Everett, the court went on to explain what open and gross lewdness and lasciviousness is. And they said, at page 327, the statutory prescription of open and gross lewdness and lasciviousness was not targeted against adultery or fornication, which other statutes make crimes. It was aimed at conduct which, by its openness and notoriety, tends to affront the public conscious and debase the community morality. And this is the important part. Conduct not in a public place or a place open to public view and which can be seen only by looking past drawn curtains and into a private residence is not open. Even though criminal under other statutes or the common law, it is not criminal under 18.2-345. Here, again, record totally devoid that Mr. Price ever solicited any sort of sexual activity in a public place or a place that was open to public view. That statute, therefore, if there was again, as Ms. Ballas alleges, a solicitation for sex, if she agreed to that, she would not have been violating 18.2-345. That can't serve as a basis for a public policy claim. Last claim is she, in her request for leave to amend, said that she wanted to say, you know, the policy against sexual assault is a basis for my public policy claim. And she didn't cite to any statute there. In the appellant's brief, I think they cite to 18.2-67.4, which is Virginia's sexual battery statute. But this is essentially the claim that was rejected by the Supreme Court of Virginia in Mitchum's case, which was a battery claim. And the court said there, trial court properly dismissed this claim because Mitchum did not allege that her employer discharged her for refusing to commit the crime. Instead, she alleged that she was fired for refusing to consent to commission of a battery upon her person. However, had she consented to having the employer touch her, there would have been no crime of battery. Here, Ms. Ballas hasn't alleged that Mr. Price said, I want you to go sexually assault somebody, and she refused. Instead, we're talking about the exact same facts as in Mitchum. She refused to consent to a commission of a battery on her person, but had she consented, we have no crime. No basis for the public policy of the district court. Judge Allen was correct in denying leave to amend as futile. Now, there was some discussion here about the intake questionnaire. The intake questionnaire is actually in the record, and it is at Joint Appendix 181. And there's some writing on the bottom of the intake questionnaire. This is the EEOC's form. And it says, it's at the bottom, there's a Privacy Act statement. It says, number four, routine uses. EEOC may disclose information from this form to other state, local, and federal agencies as appropriate or necessary to carry out the commission's functions. If EEOC becomes aware of civil or criminal law violation, EEOC may also disclose information to respondents in litigation to congressional offices in response to inquiries from parties. And then it goes on to list other ways. These questionnaires, I've been doing this a long time, and I've never seen these sent with charges. There is some law in the EEOC that one could serve as a charge for purposes of preserving a statute of limitations. But to say that the EEOC was somehow negligent by not serving the intake questionnaire when a formal charge was prepared and served would be to put a burden on the EEOC that Congress has not put on the EEOC. This court, her EEOC charges, there were two. There was an original charge and an amended charge. These charges bear little relationship to the complaint that was filed. Neither charge talks about, it's very much like the Shocko case that this court decided. The charges talk about, I was fired for a time violation and there were males who committed a similar violation and they weren't fired. And that I was sent home to change out of my ripped jeans and I complained about that and I was subsequently fired. And then in the amended charge she added the complaint about the hug in the workplace. However, if you look at the complaint, paragraph five, she was subjected to an ongoing sexually hostile work environment. Paragraph six, she complained to her supervisor on several occasions about a hostile work environment. Paragraph seven, Mr. Price frequently discussed his sex life and she complained about that. Paragraph eight, Mr. Price told a co-worker that he was attracted to Ms. Ballas. In 2000, paragraph nine, in 2008, a co-worker made false sexual remarks about Ms. Ballas. Paragraph 10, in April 2009, Price solicited sex from the plaintiff. The plaintiff complained. Paragraph 11 is the first paragraph where we get to anything that was related to something that happened in the EEOC charge. That's where she talks about the ripped jeans incident. Paragraph 12, plaintiff made repeated complaints about gender discrimination and she was denied promotions. Paragraph 13, she was terminated in retaliation for dismissing Price's advances and prior complaints of sexual harassment, gender discrimination, and hostile work environment. The only part of those allegations of her substantive allegations that were mentioned to the EEOC in the EEOC charge, and of which Huntington Ingalls was notified, was the ripped jeans incident. That was actually an untimely incident because anything that was before, I believe, September 29th of 2009 was outside three days, but it could serve as a basis for her retaliation. The EEOC, in this case, rather than getting shots taken at them, if you look at the letters that they're arguing the EEOC should have considered as charges, there's very little that is anywhere close to being timely in those letters. What the EEOC did in this case was look through this information, the vast majority of which didn't concern issues that were within the EEOC's jurisdiction, and it tried to pull out, and I think it did pull out, what could be possible viable claims under Title VII that the EEOC would have jurisdiction for. So I think the EEOC did exactly what it was intended to do in this case. And finally, on the retaliation claim, again, we're dealing with an undisputed record here. It was undisputed that the decisionmaker did not know that Ms. Ballas had made this complaint about the ripped jeans. It is undisputed that he was the decisionmaker. It was undisputed that Mr. Lohman himself was part of the investigation and that he interviewed the plaintiff about these time falsification charges. And it wasn't just Mr. Lohman, it was a human resources representative, and yes, Mr. Price. And the record's also undisputed, if you look at the joint appendix at 150, that Mr. Price didn't go seeking out some time violation by Ms. Ballas. This was reported to him by another employee that she, and another, a co-employee, Ms. Lassiter, were gone. And ultimately, Ms. Lassiter, who doesn't have any complaint that she was, you know, had been sent home for ripped jeans or had some sex discrimination complaint, Ms. Lassiter was treated just like Ms. Ballas after this investigation. They were absent together. They both had similar time issues. The company investigated it, and they took appropriate action as the company viewed it because they're a government contractor, and time falsification issues have to be taken very, very seriously in that circumstance. So unless the court has any additional questions, thank you. Thank you. I have one very short response to something that my colleague stated. He talks about context, and context is very important in analyzing each of the claims. Context is what gives the jury, allows the jury to exercise common sense to decide questions of fact, to decide credibility issues, to decide whether or not it was just a simple hug or whether it was a grabbing, whether it was unwanted or whether it was wanted. And on the facts in this case, and given the standard of review on summary judgment, including the point that has been repeated in cases over and over again, were all inferences from the facts. And she did say, Judge Floyd, that this was offensive to her. And if we are to resolve all the inferences, all the facts in favor of allowing the claim to go forward. But it's undisputed that she didn't say it to him. She has said it later. But I didn't see any indication of communication to Ms. Price that it was offensive or unwelcome. And in fact, in describing it, her only complaint was that it was awkward because she was standing up when he was leaning down. But Judge Duncan, that goes to the merits of the claim in front of the jury. There's no requirement for her to say, don't do it to me, don't do it. There's no requirement for the victim of a crime to say no or to say stop or to say. But that is correct. But it is correct also that harassment isn't a crime. I understand. But the precondition to that, to it being actionable, is that it is offensive or unwelcome. I agree. And perhaps my use of the word crime is stronger than necessary in this appeal. What I mean is the act of the defense. And there's no requirement on Ms. Ballas or any other female to say stop, don't do it. It's offensive and it's unwanted. And the jury has to make a decision based on maybe her silence, whether it was offensive. But it's the jury's, the province of the jury, to decide whether or not this act of him swooping down and grabbing her. And I looked at the deposition transcript where she explains that it wasn't a simple hug. And she tells counsel exactly what occurred. Those facts could be resolved by a reasonable fact finder in her favor. The jury could say, no, this man had no right to go into her cubicle, into this small space, before she even got up and to grab her around the waist. No right whatsoever. And it's offensive. It was unwanted. She never said, come give me a hug. She never invited him to come and do it. The jury could resolve it differently than on the facts, even if the facts were the undisputed facts. Now, I want to say this in response to your question about undisputed facts. Ms. Ballas, and I don't want to be, I don't want to make light of the fact that she was pro se. She was there. She was being examined by, I think he described himself as a seasoned veteran in this area. And she was by herself. She didn't have an opportunity to develop her own evidence. She might have added some more facts if she were on redirect by a counsel or otherwise. But what she said was enough to create an issue to be resolved by a jury. And I say that once the inferences are resolved in her favor, as they must be, summary judgment was not proper on the assault and battery. Thank you. Thank you very much. We will come down in groups.
judges: Allyson K. Duncan, James A. Wynn, Jr., Henry F. Floyd